# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 8, 2022

Lyle W. Cayce
Clerk

No. 20-50830

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RAYMOND R. VALAS, III,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:13-CR-806

Before WILLETT, ENGELHARDT, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

This is the second time Raymond R. Valas, III has challenged his conviction before this court. On direct appeal in 2016, we affirmed his conviction for "engaging in a commercial sex act with a minor in violation of 18 U.S.C. § 1591." *United States v. Valas*, 822 F.3d 228, 234 (5th Cir. 2016). Now seeking habeas relief, he alleges that prosecutors unconstitutionally suppressed a document that would have aided his case and that he received ineffective assistance of counsel during his trial and his direct appeal. Valas fails to demonstrate that any of his habeas claims merit relief. Thus, we affirm.

No. 20-50830

# I.

Valas is a former lieutenant colonel in the United States Army. *Id.* at 235. On August 26, 2013, he went with members of his New Hampshire National Guard unit to San Antonio. They were in San Antonio to review a military exercise they had completed in El Salvador. *Id.* While there, Valas stayed at the Hilton Hotel. *Id.* That night and the following night, after obtaining her contact information from an online prostitution advertisement, Valas encountered TJ, a fifteen-year-old runaway turned prostitute, in his hotel room. *Id.* Valas maintains that he briefly attempted to interview TJ as part of a project on human trafficking both nights. *Id.* TJ testified that Valas summoned her to the hotel to have sex with her. *Id.*

The jury convicted Valas of violating 18 U.S.C. § 1591, which criminalizes participating in the sex trafficking of children, including by causing a child "to engage in a commercial sex act." *Id.* at 234-35. Valas appealed the conviction and raised a host of challenges to the constitutionality of his trial. *Id.* A panel of this court rejected his arguments and affirmed his conviction. *Id.* at 248.

Just over a year later, in August 2017, Valas filed a habeas corpus petition under 28 U.S.C. § 2255 that was also styled as a motion for a new trial under Federal Rule of Criminal Procedure 33. Valas alleged various violations of his Sixth Amendment rights. First, he asserted the prosecution unconstitutionally suppressed a statement TJ gave to the Federal Bureau of Investigation (FBI) that would have aided his case. This hypothetical assertion of error—Valas essentially guessed that there must have been an unproduced statement based on other evidence—proved true. Specifically, the Government conceded in response to Valas's petition that it had failed to disclose an agent-created FD-302 summary of a March 2014 interview the FBI conducted with TJ.

2

Next, he averred that the prosecution had impermissibly vouched for TJ's credibility before the jury and that his trial counsel should have objected to those statements.  He also argued that counsel was ineffective because he did not adequately cross-examine and impeach TJ's credibility using her journal and cell phone records.

Finally, Valas contended that his direct-appeal counsel should have raised the district court's failure to give a modified unanimity instruction as an issue on appeal.  At trial, the prosecution adduced testimony that Valas had sex with TJ on two nights: August 26, 2013, and either late on August 27 or very early on August 28, 2013.  By contrast, the indictment charged

> [t]hat on or about the 26th day of August, 2013, . . . the Defendant, Raymond Valas, did knowingly . . . cause T.J. to engage in a commercial sex act, knowing that T.J. had not attained the age of 18 years, recklessly disregarding that T.J. had not attained the age of 18 years, and having had a reasonable opportunity to observe T.J., in violations of Title 18, United States Code, Sections, 1591(a) and 1591(b)(2).

Valas argued that the contrast between the prosecution's evidence and the indictment created a duplicity[1] problem requiring a modified unanimity jury instruction.  Without a proper instruction, he contended, it was likely that some jurors would conclude that he had violated the law on August 26, whereas others would conclude that he did so on August 27/28, rather than unanimously agreeing to convict Valas for the same act on the same day.

Valas filed a motion for discovery in relation to his suppression claim.  The district court denied the motion, finding that while the prosecution had suppressed the FD-302 interview summary, its contents were ultimately not

---

[1] Duplicity is "the joining in a single count of two or more distinct and separate offenses."  *United States v. Robin*, 693 F.2d 376, 378 (5th Cir. 1982).

material to Valas's defense. But the court scheduled an evidentiary hearing on Valas's claim of ineffective assistance of trial counsel. After that hearing, the court denied Valas's Section 2255 petition and Rule 33 motion in two lengthy orders, finding that Valas had failed to establish any violation of his Sixth Amendment rights. Valas now appeals the denial of his Section 2255 petition.[2]

## II.

"When evaluating the denial of a Section 2255 motion, we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Scott*, 11 F.4th 364, 368 (5th Cir. 2021) (citing *United States v. Phea*, 953 F.3d 838, 841 (5th Cir. 2020)). We address each of the issues Valas raises in turn.

## A.

Valas asserts that the prosecution violated his Sixth Amendment rights to a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing evidence favorable to his case. We review this issue de novo with deference to the district court's underlying factual findings. *United States v. Bolton*, 908 F.3d 75, 90 (5th Cir. 2018) (quoting *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018)). To prove a claim under *Brady*, a petitioner "must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *Reeder v. Vannoy*,

---

[2] Valas's briefing on appeal makes no reference to Rule 33 and each of his arguments is couched in favor of "habeas" relief. To the extent Valas properly moved under Rule 33 in the district court for a new trial, any potential arguments related to that motion are forfeited because he has not briefed them. *Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020) (quoting *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004)).

978 F.3d 272, 277 (5th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Glenn*, 935 F.3d 313, 319 (5th Cir. 2019)); *see also Youngblood v. West Virginia*, 547 U.S. 867, 868–70 (2006) (per curiam) (applying *Brady* to evidence known by government investigators but allegedly unknown by prosecutors); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (applying *Brady* to impeachment evidence). As to the third element, "[s]uppressed evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Reeder*, 978 F.3d at 277 (emphasis added) (internal quotation marks omitted) (quoting *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018)). "Different" means that "the suppressed evidence 'undermines confidence in the outcome of the trial.'" *Id.* (internal quotation marks omitted) (quoting *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017)).

At issue is an FD-302 summary of a March 2014 interview of TJ conducted by an FBI agent. The FD-302 is a form used by the FBI to memorialize conversations between an agent and an interviewee. Basically, "302s" capture the interviewing agent's notes of a witness interview, and they are routinely part of criminal investigations conducted by the agency. So much so that, as noted above, Valas's habeas counsel was able correctly to guess that a 302 was missing in this case, forcing the Government to concede that it "inadvertently" failed to produce the document before trial. The parties thus agree that the 302 was suppressed by the prosecution; they contest the other two elements of the *Brady* test—whether the evidence was favorable to Valas and material to the outcome of his trial.

The district court denied Valas's claim without addressing whether the evidence was favorable to Valas. Assuming it was, the court found that Valas had failed to demonstrate that the 302 was material. Much of the

No. 20-50830

parties' briefing on appeal thus grapples over the third element. Our analysis will focus there as well.

But before we proceed, we emphasize that the Government's concession that it suppressed the 302 is correct. The Government's only justification for its lapse, that the failure to produce the 302 to Valas was "inadvertent," is troubling. It is difficult to grasp how a document as routine as a 302 would be overlooked, particularly in this instance. TJ was the crucial witness for the prosecution, the only one who actually accused Valas of criminal activity. And the agent who prepared this 302 *also* testified, so defense counsel was deprived of the opportunity to use the document in cross-examining *two* witnesses, not just one. We note that, unfortunately, this is not the first time something like this has happened, *e.g.*, *United States v. Perea*, 625 F. Supp. 2d 327 (W.D. Tex. 2009). We admonish the Government to endeavor to make it the last.

Nonetheless, as the district court concluded, Valas's claimed *Brady* violation falters because he fails to show how the 302 is material. The 302 itself is fairly short. It consists of ten paragraphs. The first identifies TJ and the location of the interview. Four through ten recount that the investigators showed TJ photographs and TJ identified individuals from them. Only the second and third paragraphs relate to Valas. The second paragraph indicates that TJ identified Valas from a photo array. The third encapsulates details about her encounter with Valas:

> [TJ] remembered that VALAS was very surprised when [TJ] showed up to his room because VALAS thought that the photos on the advertisement were "fake." VALAS took [TJ]'s clothes off slowly and had unprotected sex. VALAS told [TJ] he was in San Antonio on business and that he was flying back to New York in two days. [TJ] told VALAS that she was 18 because that is what she was instructed to do by [her pimp]. VALAS did not ask her to have unprotected sex and although

6

[TJ] had a condom with her, she did not ask him to put it on. [TJ] did not remember if VALAS paid her $130.00 or $150.00. VALAS called her for a second date the next day or two days later. During the second date they used a condom and VALAS paid her the same amount as the first time. VALAS told [TJ] that he was in love with her and wanted her to go with him. [TJ] did not remember if VALAS had any tattoos, however she remembered that "when he smiled his dimple would pop."

Valas asserts that the 302 is material because of its impeachment value stemming from the differences between its summation of TJ's statement and her trial testimony. At trial, TJ stated that the first night they met, neither she nor Valas had a condom, he struggled with flaccidity, and ultimately the two engaged in oral sex and non-penetrative anal sex.[3] She also testified that Valas paid her $150 for that night.

This testimony admittedly seems to differ from the 302's account of TJ's statement to the FBI, but the differences are in magnitude of detail rather than substance. At best, the interview notes could have been used to force TJ to explain how the sexual actions she described at trial fit under the heading of "unprotected sex" used in the 302 and whether TJ or Valas actually had condoms in the hotel room. These differences are hardly the grand "gotchas" Valas makes them out to be. To the contrary, none of the variances are likely to have dented the jury's assessment of TJ's credibility.

There is perhaps a closer question regarding the use of the 302 in cross-examining the FBI agent who created it. As we discuss *infra* in Part II.B.2., counsel's strategy in cross-examining TJ was fraught with risk, e.g.,

---

[3] Valas also points to purported inconsistencies between the 302 summary and TJ's journal entries. Her journal generally mirrors her trial testimony but additionally recounts that TJ and Valas engaged in "breast sex." Valas asserts that his counsel should have been able to exploit this discrepancy as well. For the reasons discussed above the line, this detail likewise fails to move the needle in Valas's favor.

that she might effectively explain inconsistencies or come across as *more* sympathetic, irrespective of whether counsel used the 302. There may have been some upside, and less potential downside, in using the 302 to interrogate the agent. However, if the 302 would have had only marginal impeachment value used with TJ directly, it may have been even more attenuated to try to amplify these alleged inconsistencies through another witness. In any event, Valas does not offer any argument regarding the agent's testimony, so we decline to evaluate this issue further. The impeachment value of the 302 is insufficient to undermine confidence in the trial and the jury's verdict, such that the 302 is not material, and Valas's *Brady* claim therefore fails. *Reeder*, 978 F.3d at 277.[4]

## B.

We next turn to Valas's ineffective assistance of counsel claims. "[T]he Sixth Amendment entitles a criminal defendant to *reasonable*, but not *perfect*, representation of counsel." *United States v. Valdez*, 973 F.3d 396, 404 (5th Cir. 2020). To succeed on an ineffective assistance of counsel claim, a petitioner must establish "that (1) his 'counsel's performance fell below an objective standard of reasonableness,' and (2) that his counsel's deficient performance caused him prejudice." *Id.* at 402 (quoting *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004)); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner demonstrates prejudice if he shows

---

[4] As a final note, it is also debatable whether the 302 is actually beneficial to Valas under the first *Brady* element. As noted above, its impeachment value is marginal. While the 302 differs from TJ's testimony in some ways, it also provides a direct statement about Valas's dimple that, if corroborated, could have increased TJ's credibility, not diminished it. At the end of the day, we need not further delve into this issue because, assuming the 302 would have benefitted Valas and, as the Government concedes, it was suppressed, it was not material in terms of its likely effect on the trial or the verdict.

"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Valdez*, 973 F.3d at 402 (internal quotation marks omitted) (quoting *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002)). Finally, "judicial scrutiny of counsel's performance must be 'highly deferential' because '[i]t is all too tempting for a defendant to second-guess counsel's assistance after . . . [an] adverse sentence, and it is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable.'" *Id*. at 403–04 (quoting *Strickland*, 466 U.S. at 689).

Valas makes three arguments regarding ineffective assistance of counsel. He contends that his direct-appeal counsel failed to press the potential lack of jury unanimity due to the district court's failure to instruct the jury adequately; he argues that his trial counsel did not effectively cross-examine TJ; and, finally, he asserts that his trial counsel also failed to object to the prosecutor's improper vouching for TJ's credibility during closing.

### 1.

"Appellate '[c]ounsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent.'" *Moore v. Vannoy*, 968 F.3d 482, 489 (5th Cir. 2020) (quoting *Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008)). When reviewing the effectiveness of appellate counsel, the relevant question is whether the argument the petitioner asserts should have been made was "sufficiently meritorious such that . . . counsel should have raised it on appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). "Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was *plainly stronger* than those actually presented to the appellate court." *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) (emphasis added) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

No. 20-50830

Valas argues that there was a genuine risk that the jury became confused and failed to reach unanimity in its verdict because some believed he committed the charged offense on one day (August 26) through one set of actions, while other jurors believed he committed the charged offense on another day (August 27/28) through different actions. Given this risk, Valas asserts his appellate counsel ought to have raised the district court's failure to give an instruction to the jury clarifying that they all had to agree that he committed the same act on the same day. The district court rejected this habeas claim because it found (1) the unanimity argument had been waived such that appellate counsel would have needed to prove plain error on appeal and (2) the argument was in any event not meritorious.

Scrutinizing the record, Valas failed to preserve his objection to the district court's failure to provide an additional instruction clarifying or modifying the standard unanimity instruction. Federal Rule of Criminal Procedure 30(d) requires that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Failing to do so means an argument related to the jury instructions is not preserved and can be reviewed only for plain error. *United States v. Spalding*, 894 F.3d 173, 187 (5th Cir. 2018) (citing *United States v. Gibson*, 875 F.3d 179, 195 (5th Cir. 2017); FED. R. CRIM. P. 30(d)).

To show that his trial counsel preserved the point, Valas offers a somewhat ambiguous statement by counsel during the charge conference:

> [K]eep in mind that the date charged in the indictment is Monday, the 2[6]th. Tuesday, the 2[7]th, is not charged in the indictment. And in terms of this charge conference, I'm very concerned about confusion, and I'm very concerned about the jury making a determination where several think that he did it

No. 20-50830

> on Tuesday, several think that he did it on Monday, and that that's unacceptable under our law. And I object to that.
>
> I'm not exactly sure how the Court needs to fix it. I think it's a problem with the way that it was indicted. But nonetheless—like, for instance, similar acts may—what are the similar acts? The similar acts – the only similar act is Tuesday, the 27th. But this jury needs to be told that they cannot convict him for what happened on—or what they believe—if they find beyond a reasonable doubt that anything happened, it could only be used to determine whether the event took place.

While counsel raised an objection that jury "confusion" could lead it to convict for different offenses on different days, counsel did not "object[] . . . to a failure to give a requested instruction." Fed. R. Crim. P. 30(d). Instead, counsel stated that it was not clear "how the Court need[ed] to fix it," and pivoted to "the way that [the case] was indicted." This is a rather tenuous basis on which to argue that counsel "inform[ed] the court of the specific objection" being raised regarding a failure to instruct the jury. *Id.* Accordingly, appellate review of this issue would have been framed by plain error analysis.[5] We thus view Valas's current ineffective assistance claim mindful of that exacting standard.

Valas asserts that *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991), demonstrates the merits of his unanimity argument. In *Holley*, this court reversed a conviction for perjury, concluding both that the indictment in the

---

[5] To prove plain error, an appellant must demonstrate (1) "an error; (2) the error must be clear or obvious . . . (3) the error must have affected the appellant's substantial rights . . . ; and (4) the court must decide in its discretion to correct the error." *United States v. McGavitt*, 28 F.4th 571, 575 (5th Cir. 2022) (quoting *United States v. McClaren*, 13 F.4th 386, 413 (5th Cir. 2021)). Additionally, as Valas did not propose an instruction, the plain error consideration would have been limited to whether the district court's "charge, as a whole, [was] a correct statement of the law clearly instruct[ing] the jurors." *Spalding*, 894 F.3d at 187 (quoting *United States v. Kay*, 513 F.3d 432, 446 (5th Cir. 2007)).

case was duplicitous and the instructions given to the jury did not cure that problem.  942 F.2d at 928-29.  But *Holley* is distinguishable because, *inter alia*, unlike in that case, Valas was charged with a single offense:  causing TJ "to engage in a commercial sex act" "on or about the 26th day of August, 2013."  While the Government introduced evidence that Valas had sex with TJ on both August 26, and either late on August 27 or early on August 28, "[a]n indictment's allegations, and not the evidence adduced at trial, control whether the indictment is duplicitous . . . ."  *United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009); *see United States v. Sila*, 978 F.3d 264, 269 (5th Cir. 2020) (similarly finding that duplicity is a question of indictments, not of evidence adduced at trial).[6]

Valas also argues that a footnote in this court's prior opinion deciding his direct appeal shows the value of this argument.  There, the court noted that "the indictment and the Government's 'on or about' argument might have raised a duplicity concern," but declined to address the issue further because Valas had forfeited it.  *Valas*, 822 F.3d at 237 n.2.  Far from establishing the merit of this issue, though, the *Valas* footnote merely identified it as a *potential* concern.

Regardless, Valas's present endeavor is not to show that the unanimity argument was worthwhile or meritorious, but that it "was plainly stronger" than the seven other issues raised in his direct appeal.  *Davila*, 137

---

[6] Further, even though the Government introduced evidence of Valas's conduct on both August 26 and August 27/28, the district court expressly instructed the jury that "to return a guilty verdict for Count 1, all of you must agree that the same way of committing the offense . . . has been proved beyond a reasonable doubt."  *Cf. Holley*, 942 F.2d at 929.  Even assuming some residual concern about unanimity, assessing whether the district court's charge, as a whole, was a correct statement of the law, *Spalding*, 894 F.3d at 187, we do not discern error that is "'clear' or, equivalently, 'obvious,'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (quoting *United States v. Young*, 470 U.S. 1, 16, n.14 (1985)).

No. 20-50830

S. Ct. at 2067 (citing *Smith*, 528 U.S. at 288).  His briefing does not address this question, such that this claim fails for that threshold reason alone. Beyond that, looking through the lens of plain error, we do not see that Valas's argument is so meritorious that it would have been "plainly stronger" than the other issues counsel actually raised on direct appeal. Accordingly, his claim of ineffective assistance of appellate counsel fails.

**2.**

Valas next asserts that his trial counsel was ineffective because counsel did not adequately cross-examine TJ.  "Because decisions regarding cross-examination are strategic, they usually 'will not support an ineffective assistance claim.'"  *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (quoting *Dunam v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)).

Valas's arguments here boil down to two contentions.  First, he contends that his counsel should have confronted TJ with the FBI's 302 interview summary[7] and her journal entries in order to discredit her regarding the specifics of the two encounters with Valas.  Second, Valas maintains that counsel should have confronted TJ with her phone records to demonstrate that, because she either texted or called people for much of the time she was supposed to be with Valas, she could not have had sex with him.

Regarding his first argument, Valas posits four inconsistencies between TJ's testimony and her statements reflected in the 302 summary and her journal:  whether Valas used a condom; whether the sex acts on August 26 were "unprotected sex" as her initial statement said, or oral sex, non-penetrative anal sex, and "breast sex" as her journal stated; Valas's

---

[7] Valas reasons that, had the 302 not been suppressed, it would have been useful in cross-examining TJ, such that his counsel's inability to use it during cross rendered counsel's representation ineffective.

inability initially to get an erection; and the payment amount. Valas argues that forcing TJ to explain these inconsistencies would have undoubtedly discredited her in the eyes of the jury. As discussed *supra* in Part I.A., this is unlikely for several reasons.

The 302 is not overly detailed (and it was prepared not by TJ, but by the interviewing agent). Its description of their first encounter states that Valas removed TJ's clothing and "had unprotected sex" with her. Conceivably, the actions TJ described at trial could fit under the heading of "unprotected sex." And when comparing the relatively short 302 summary with TJ's trial testimony, it is evident the other inconsistencies could easily be explained away as well. TJ's more detailed journal is essentially *consistent with* TJ's trial testimony. It begins with her running away from home, recounts how she met the pimp who would market her, details several liaisons with other individuals, and provides significant detail regarding her encounters with Valas. The only alleged discrepancy Valas raises based on the journal centers on whether he used a condom during the encounters. But as with the 302's purported discrepancies, had TJ been confronted on this point, she could have explained it fairly easily. In any event, it is hardly a contradiction that would have undermined the trial's outcome.

And counsel did not exactly leave TJ unscathed during cross- and recross-examination, which spanned roughly 600 transcript lines during trial. Valas acknowledges that counsel extensively cross-examined TJ, adducing testimony from TJ that she was on probation; smoked marijuana; used alcohol during her weeklong stint as a prostitute; stole a gift card from her mother before she ran away; had difficulty remembering places; listed her age on Backpage.com as nineteen, not fifteen; and texted and called people constantly. The additional inconsistencies that Valas now proffers would have been unlikely to discredit TJ before the jury any more than the testimony actually elicited did. Indeed, giving TJ a chance to explain might

have harmed Valas's defense and made the fifteen-year-old witness more sympathetic.  As a matter of strategy, Valas's trial counsel did not act unreasonably by refraining from confronting TJ with her journal statements. *Valdez*, 973 F.3d at 404 ("[T]he Sixth Amendment entitles a criminal defendant to *reasonable*, but not *perfect*, representation of counsel.").

Turning to Valas's assertion regarding TJ's cell phone records, Valas asserts that he has identified only two gaps of time, one three minutes long and the other six, between 9:00 and 9:30 p.m. on August 26 when TJ was not texting or calling someone.  He asserts that had his counsel raised this on cross-examination, TJ's cell phone use would have contradicted her testimony that she performed sex acts with Valas between 9:00 and 9:30, significantly damaging her credibility.  As with her journal entries, however, confronting TJ with the records may have allowed her to explain them, as her cell phone use is not *necessarily* inconsistent with her testimony that Valas and she engaged in two to three discrete sex acts on August 26.

In like manner, Valas goes to great lengths to show that TJ was using her cell phone almost constantly from 1:00 to 1:30 a.m. on August 28.  Valas argues that TJ should have been confronted with the phone's activity logs because she testified that she and Valas had sex between 1:00 to 1:30 that night.  But TJ's testimony was that she arrived at Valas's hotel room *around* 1:00 a.m.  She testified to an approximation of the events that occurred the night of August 27/28.  Additionally, the times immediately before 1:00 and after 1:30 a.m. show gaps in phone activity.  As with the prior night's records, asking TJ about the phone log for August 28 may well have backfired.

Rather, the record bears out that Valas's counsel made a strategic decision not to ask TJ about the details in her phone records.  Instead, counsel walked through the cell phone log with the jury in his closing argument, making the exact argument that Valas asserts should have been explored in

cross-examination. Thus, contrary to Valas's current depiction, his trial counsel did not wholly abandon TJ's cell phone data. Instead, counsel strategically deployed the records, without any potential explanation from TJ regarding the alleged discrepancies, as one of the last things the jury was presented before it deliberated.

Moreover, Valas's counsel also impeached TJ's credibility in other ways. Valas's counsel elicited damaging facts about TJ from other witnesses, and introduced evidence that undermined TJ's reputation for virtue and veracity. *See Russell v. Collins*, 944 F.2d 202, 204–06 (5th Cir. 1991) (noting that eliciting negative testimony from other witnesses was a reasonable strategy for impugning a witness's credibility). Against this record, and particularly given the presumption accorded cross-examination strategy in assessing effectiveness of counsel, *Bernard*, 762 F.3d at 472, Valas's trial counsel's efforts to impugn a volatile fifteen-year-old witness's credibility "[fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In other words, counsel's cross-examination of TJ was not "so ill chosen that it permeate[d] the entire trial with obvious unfairness." *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006) (internal quotation marks omitted) (quoting *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004)). Accordingly, this issue lacks merit.

### 3.

Valas's final ineffective assistance of counsel claim relates to the prosecutor's closing argument. Valas asserts that his trial counsel was ineffective because counsel did not object to the prosecutor's improper vouching for TJ's honesty.

Generally, "[a] prosecutor may argue fair inferences from the evidence that a witness has no motive to lie, but cannot express a personal opinion on the credibility of witnesses." *United States v. Gracia*, 522 F.3d

597, 601 (5th Cir. 2008) (citing *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)). This court's test "for improper vouching for the credibility of a witness is 'whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.'" *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (quoting *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977)). Of course, "[o]ften, the decision as to whether or not to object to particular statements made in closing argument is a matter of tactics. Since an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of [an] objection may be more prejudicial than the original remarks[.]" *Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970) (citing *Williams v. Beto*, 354 F.2d 698, 705–06 (5th Cir. 1965)).

The prosecutor began his closing argument with this theme: "It is true. It is true. [TJ] is telling you the truth." Then after explaining certain aspects of the court's instructions, the prosecutor transitioned to the substance of the case, stating "[n]ow, we're going to get to the elements and really kind of discuss how TJ is telling the truth." The prosecutor discussed the age requirement for conviction, then transitioned: "So why is [TJ] telling the truth? Because her story is indiscriminate and consistent . . . . [S]he has always been consistent, and she has always been indiscriminate." After discussing evidence that corroborated TJ's story, the prosecutor reiterated parts of TJ's testimony and asked: "Why? Why would she have to lie about the details? She wouldn't. If she was making this up, she'd say, we had sex twice. I can't remember—I mean, it was—it was too long ago. I can't remember. Sex twice. Why get into the details?" Then, after addressing the defense's suggestion that TJ was motivated to lie because she was not paid by Valas, the prosecutor repeated his rhetorical questions and commented on Valas's partial corroboration of TJ's story:

> And why lie about two days? I mean, if we're making this up, I mean, what's so significant about two days versus one day? Wouldn't one day be good enough? Valas agrees, right? Because he has to. He has to up to the point where everything corroborates her story. She is a truth-teller. But he wants you to believe that as soon as the documents stop, then he can come out and say she's not telling the truth . . . . He's willing to go up to that point because he knows he can't escape the corroboration.

Considered in isolation, some of the prosecutor's statements appear suspect. But the test is not simply whether the prosecutor cast a witness as a "truthteller," as Valas argues. Instead, we examine "the comment[s] in context." *McCann*, 613 F.3d at 495 (internal quotation marks omitted) (quoting *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004)).

The prosecutor's first statement echoed Valas's counsel's opening statements to the jury three days earlier—"It's not true. It's not true. It's not exactly what happened."—but argued the contrary. Seizing upon the theme, the prosecutor reminded the jury of the events that opened the trial and stated the Government's position, before proceeding to discuss the evidence presented during the trial purportedly supporting that position. Given the rhetorical context in which the prosecutor's first statement was made, it is unlikely that the jury would have understood it to communicate that the prosecutor had some secret basis for asserting that Valas was guilty. *Id.* at 496.

The prosecutor's next statement merely transitioned to explain "how TJ [was] telling the truth" by "get[ting] to the elements" of the charged crime. The statement itself is not a declaration that TJ was truthful, but rather an introductory statement into a further discussion. Thus, considered in context, the jury would have had no reason to deduce that the prosecution had secret, undisclosed evidence that tended to establish Valas's guilt. *Id.*

No. 20-50830

The subsequent references to TJ "telling the truth" and disclaiming her "motive to lie" are couched around the prosecutor's discussion of the evidence in the case. Given that the statements were embedded in a reprise of the evidence adduced at trial, "the prosecutor . . . made fair inferences respecting the witnesses' credibility, and referred to the record evidence on which his statements were based." *United States v. Surtain*, 519 F. App'x 266, 292 (5th Cir. 2013); *see McCann*, 613 F.3d at 496; *Gracia*, 522 F.3d at 601. Rather than suggesting to the jury that the prosecution had other evidence to prove Valas's guilt, the statements tend to show the prosecutor's belief in the persuasiveness of the evidence adduced during trial.

Because none of the prosecutor's statements, taken in context, constitute improper vouching, Valas cannot argue that his trial counsel should have objected to them and was ineffective for not doing so. And even if the prosecution acted improperly as to some of its closing remarks, Valas fails to show how any strategic decision on his counsel's part not to object rises to ineffective assistance. Therefore, this claim also falters.

## III.

Because Valas has failed to demonstrate that the prosecution violated the Sixth Amendment in its failure to produce the FBI's FD-302 notes of its March 2014 interview of TJ, or that he received ineffective assistance from either his trial or appellate counsel, the judgment of the district court is

AFFIRMED.